**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
                                        :

**UNITED STATES OF AMERICA,**       :       **20 Cr 234 (LAP)**

                                          :

            -v-               :

                                          :

**DEVONTE FRANCIS**

                                          :

             **Defendant.**       :
---------------------------------------------------------X

## SENTENCING MEMORANDUM

Submitted by:

Xavier R. Donaldson

Attorney for Devonte Francis

1825 Park Avenue, Suite 1102

New York, NY 10035

212-722-4900

xdonaldson@aol.com

**Donaldson & Chilliest, LLP**
**1825 Park Avenue, Suite 1102**
**New York, NY 10035**
**212-722-4900**
**212-722-4966**

May 18, 2023

**VIA Email**
Honorable Loretta A. Preska
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

        Re:    *United States v. Devonte Francis*
              20 Cr 234 (LAP)

Dear Judge Preska:

      Please accept this letter on behalf of Mr. Francis regarding his sentencing to be held on May 24, 2023.

**ANALYSIS OF 18 USC 3553 FACTORS**

      18 USC Section 3553 calls upon this Court to consider specific factors, including the appropriate Sentencing Range, to impose a sentence on a defendant that is "sufficient but not greater than necessary" to comply with the goals of sentencing.  *See, 18 USC Section 3553(a)*.  Indeed, any sentence imposed by the Court must be based upon an individualized assessment based upon the unique factors presented.  *See*, *U.S. v. Gall*, 552 US 38, 39 (2007).

      Significantly, the United States Sentencing Guidelines merely reflect a "rough approximation of sentences that might achieve section 3553(a)'s objectives".  *See*, *Rita v. United States* 551 US 338, 350 (2007).  The Court "may not assume that the Guidelines Range is reasonable."  *Gall,* at 50.  As the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id*., at 351 (emphasis in original).

      After giving both parties an opportunity to argue for whatever sentence they deem appropriate, the District Court should then consider all of the 3553(a) factors to determine whether they support the sentence requested by a party".  *U.S. v. Gall*, at 49-50.  It is our opinion that after considering all the factors articulated in 18 USC 3553, this Court should sentence Mr. Francis to an incarceratory term of up to forty-eight (48) months which we believe is "sufficient but not greater than necessary" for Mr. Francis's participation in this criminal conspiracy.

*Nature and circumstances of the offense*

Mr. Francis pleaded guilty to participating in a conspiracy to commit robberies and sell marijuana as a part of his membership in a local street gang. He has already served prison time in a New York State prison for his conduct. Indeed, on the day he was supposed to be released from State Custody in 2020, Mr. Francis was transferred to federal custody for the same crimes that he had already pleaded guilty in State Court.

*Guidelines Analysis*

We agree with the Guideline Analysis contained in the Final Presentencing Report finding that Mr. Francis has Criminal History Category of III and a Guidelines Offense Level of 29.  Thus, his sentencing guideline range is 108 – 135 months.

We note that at 108 - 135 months, the Probation Department suggested a sentence variance to 72 months. We are actually suggesting that Mr. Francis be sentenced to forty-eight months of incarceration with credit for the time (approximately 20 months) he served in city and state facilities for relevant conduct and charges contained in this Indictment. [1]

(1)    NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY OF AND CHARACTERISTICS OF THE DEFENDANT

**Characteristics of the Defendant**

Mr. Francis was born in Bronx County on May 21, 2000 to Michael Francis and Tanisha Syms.  His mother, Ms. Syms, is currently a full time home health aide. Prior to her employment as a home health aide, Ms. Syms tried to maintained several part and full time jobs that she thought would help her provide for her children.

Mr. Francis father, Michael, left the home when Mr. Francis was about seven (7) years old.  Consequently, for the last fifteen (15) years, Mr. Francis and his biological father have had very little interaction.. Occasionally and rather traumatically, Mr. Francis would see his father walking around the neighborhood yet they would barely speak to each other. Indeed, the two of them would barely waive to each other. When asked why, Mr. Francis simply said "I had nothing to say to him…he acted like either he didn't know me or didn't want to speak to me…so I wasn't going to go speak to him…No way…I'm not talking to him."[2] The only other "father figure" Mr. Francis knew was Mr. Pinales, his mother's boyfriend and the father of Mr. Frances' step sister.  Unfortunately, Mr. Pinales was incarcerated when Mr. Francis was young and later died of a stab wound.

---

[1] Based upon our information, Mr. Francis was incarcerated at Rikers Islant on relevant conduct for this case in January of 2019.  He remained at Rikers Island until he was transferred to the Downstate Facility in December of 2019. He then was transferred to the Greene Correctional Facility in February of 2020 and remained there until September 2020. In September 2020, he was discharged from Greene and immediately transferred to Federal Custody. Hence he has been in custody related to charges contained in this Indictment since January of 2019.

[2] As an observation, every time the undersigned attempts to speak to Mr. Francis about his biological father, Mr. Francis' head drops and there is an obvious frustration and look of despair on his face. It's almost as if Mr. Francis wishes that he could speak to his father but his pride will not let him do it.

Growing up in the Bronx without a father figure was difficult at times for Mr. Francis. This explains his outbursts during school and the few times he was suspended.  His mother, Ms. Syms, did the best she could do at home by working multiple jobs, moving the family when necessary and trying to keep Mr. Francis safe.   There is no doubt, however, that Mr. Francis needed a sound father figure in the home.

Regrettably, the young men in the neighborhood, also without father figures, increasingly became Mr. Francis go to source for support and guidance.  These "trollers", like permanent light poles strategically placed every ten meters on his block, were present each and every time he left his home and each and every time he voluntarily or involuntarily exited his school.

Hence, whenever Ms. Syms tried to discipline Mr. Francis, the neighborhood "trollers" would offer him support, guidance and friendship. He found a family outside his home that substituted for his father inside the home. This "extended family" helped persuade Mr. Francis that they could help him obtain material items that his mother and father could not provide. Through these "trollers", Mr. Francis was convinced that these "material" items were necessary to "get along" in his neighborhood and remain a member of the "extended" family. So Mr. Francis did what all the other "extended" family members were doing—nickel and dime marijuana sales and street robberies to obtain clothing.  Even though Mr. Francis was selling marijuana and participating in "gang activities", Mr. Francis was by all accounts a bright student.

When Mr. Francis was in the eleventh grade, he was arrested on state charges related to this Indictment. As a consequence, Mr. Francis did not complete high school. Mr. Francis ultimately pleaded guilty and was sentenced.  Regrettably, this arrest removed him from high school and placed him inside of a penitentiary.   Though Mr. Francis was removed from high school, he still tried to obtain his GED and some programming while incarcerated. To that end, at the Greene Correctional Facility, Mr. Francis enrolled in courses and was trying to obtain his GED. Unfortunately, COVID struck and all of his classes were immediately canceled. Nevertheless, Mr. Francis committed himself to changing his mentality and conduct. To that end, he ceased participating in "organizational conduct" while incarcerated. He read as many books as he could and he maintained a clean disciplinary record.  To be clear, he did not receive a single ticket while inside of the New York State Penitentiary and was looking forward to being released. Mr. Francis believed he had been properly punished for his impulsive conduct, had been rehabilitated in a state penitentiary and was ready to come home. Unfortunately, while preparing to leave the State prison, he was immediately transferred into federal custody during the worst Pandemic in history.

As mentioned above, although his arrest in State Court related to charges contained in this Indictment prevented him from acquiring his Diploma, he is currently studying to get his GED while incarcerated at the Metropolitan Detention Center. Because of his relative youth and his age at the time of his arrest (18), he does not have an employment history, but he has informed me that he is excited about getting his GED, acquiring certificates while incarcerated and becoming a productive member of society upon his release.

## (2)    NEED FOR THE SENTENCE IMPOSED

**Reflect seriousness of the offense, promote respect for law & just punishment**

A sentence of forty-eight (48) months of federal incarceration will reflect the seriousness of the offense, promote respect for the law and provide just punishment. There is no doubt that the crimes committed by Mr. Francis were very serious. We note, however, that Mr. Francis is not the same person that he was when he entered the city and state jails n 2019. Moreover, at eighteen (18) years old, Mr. Francis was barely an adult and still making rather impulsive decisions clearly based on simplistic thoughts of what was important: material items.  There was no real profit or intent to make significant money, Mr. Francis was simply committing criminal conduct when his mother did not or could not provide for him.

**Afford adequate deterrence to criminal conduct**

Mr. Francis has been incarcerated since 2019 related to the charges contained in the Indictment. But for two tickets at the Essex County Jail related to "self defense", he has been a model inmate. We understand that this is expected when a person is incarcerated. We note, however, that these are not regular times to be incarcerated in a federal facility in the New York City Metropolitan area including Essex County New Jersey.

Significantly, being housed at MDC and the Essex County Jail is beyond regular. We recognize that being incarcerated is a stressful existence. But being incarcerated at Essex during the COVID pandemic was severely stressful, painful, exhausting, daunting, challenging, inhumane and cruel.  Mr. Francis should know—he has served time in the State Facility.  Mr. Francis has indicated on several occasions that his time at Essex County Jail from 2020 to 2022 months has been exceedingly worse than any amount of months that he had spent in any State facility.  To his credit, amongst all the stories of severe gang conduct, illegal use of drugs, illegal use of cell phones and numerous assaults, Mr. Francis has done his very best to stay out of trouble.  Indeed, Mr. Francis "has maintained his head when all around him were losing theirs."  This means that since Mr. Francis has been arrested, he has been working toward rehabilitation and reentering society better than when he entered federal custody.

Importantly for Mr. Francis, he has already suffered very personal collateral consequences. Indeed, for almost two years, Mr. Francis was not able to see or hug his mother. This is particularly significant because prior to this arrest, Mr. Francis was extremely close to mother.  Notably, prior to Mr. Francis being imprisoned related to this case, he spoke to his family members multiple times per day. To Mr. Francis, family was very important and prior to this incident, the bulk of his time was spent with his mother or grandmother.  Thus, being in jail during the pandemic has likely been more harsh on Mr. Francis than an inmate who did not have a very close relationship with his/her family.

Additionally, when we speak of "deterrence", we must consider whether there is a likelihood of recidivism or a return to criminal behavior. In this case, there almost assuredly will not be.

Furthermore, in the context of similar situated persons, Mr. Francis is less likely to recidivate because in large part, he has significant family support committed to ensuring that Mr. Francis has a productive lifestyle upon his re-entering society. We note that although, he was not allowed to physically touch his mother for almost two (2) years, they remained in contact on the phone as often as possible. Currently, he speaks to his mother approximately four (4) times per week. And, the primary reason for this criminality in this case is no longer existent: an immature pursuit of material things without working for them.

In this case, one question, should be "what amount of incarceration would serve to deter Mr. Francis from future criminal conduct because of his conviction in this matter?" Notably, there is absolutely no statistical evidence that longer sentences equal more deterrence. Hence, any sentence over 48 months will not guarantee specific deterrence any more than a sentence of 48 months will.

Another relevant question related to this sentence is "what amount of incarceration would serve as a protective measure for society?" We would argue that forty-eight (48) months away from society is sufficient to protect society from any possible criminal conduct from Mr. Francis. He has been incarcerated under the most stringent and harsh conditions and has not so much as had an argument with a guard or prisoner. Mr. Francis does not commit antisocial or criminal conduct while incarcerated. Anything more than forty eight (48) months would simply amount to a random number speculating that said number is sufficient.

**Protect the public from further crimes of the defendant**

Rehabilitation begins after a person is incarcerated related to criminal activity. As we previously indicated, while in State and BOP custody at an upstate State facility, the Essex County Jail and now at MDC Mr. Francis has maintained a steady head and avoided most conflict.

Moreover, after speaking with Mr. Francis's mother it is crystal clear that Mr. Francis maintains family support. Indeed, the "single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return…" *"Recidivism and Parental Engagement", supra,* at 196-197. Mr. Francis enjoys a very healthy relationship with his mother and his step siblings.

**Provide defendant with needed educational, vocational, medical care or other treatment**

As previously indicated, although Mr. Francis did not complete high school he began classes for his GED at the Greene State facility and is currently working to obtain his GED while housed at MDC. We also note that Mr. Francis is receiving medication for asthma and we would like whatever current prescriptions he is taking to continue until his sentence is complete.

Thus, we are strongly suggesting that the Court urge the Bureau of Prisons to allow Mr. Francis to take advantage of and participate in any vocational or educational courses that would allow him to increase the possibilities of a successful re-entry into society upon his release. We are also suggesting that Mr. Francis be housed in a facility as close to his New York City as reasonably possible in order to continue and facilitate family visits.

**BELOW GUIDELINES SENTENCE DUE TO COVID-19**

As the Court is aware, Mr. Francis was brought to federal custody in September of 2020. Prior to that, he was on Rikers Island from January 2019 to December 2019; in Downstate Facility from December 2019 to February 2020; and the Greene Facility from February 2020 to September 2020. Prior to 2019, Mr. Francis saw his family members almost every day.  Even though he was admittedly involved in criminal activity, Mr. Francis was very close to his family.

In February 2020, however, his close contact with his family evaporated. Although Mr. Francis tried to speak to his family almost every day after February 2020, his attempts were acts of futility.  In fact, the prospect of some contact with his family is what he thought was going to help him thru the lonely days and harsh nights while incarcerated. Prison, in the United States, was supposed to be punishment but humane. Between February 2020 and the date he was transferred to the Metropolitan Detention Center Mr. Francis actually felt like he was being treated as less than a human being. This is remarkable in that MDC has a reputation for having extremely harsh conditions. But at MDC, Mr. Francis was at least allowed to have personal contact with his loved ones. Prior to MDC, Mr. Francis had spent almost two (2) years without being able to hug his mother; hold her hand; give her a gentle kiss; or simple remember her motherly fragrance.  The humanity of physical contact was completely taken away from Mr. Francis.

There can be no doubt that March 2020, the month COVID-19 became a reality in this Country, forever changed incarceration for defendants in the United States. The measures necessary to slow the progress of the disease – social distance, masks, adequate hygiene – were and still are impossible inside a prison. Crowded into small areas, communal dining, sleeping in close quarters, toilets shared by dozens of inmates, phones passed from one inmate to another, shared computers, no sanitizing wipes, limited soap and cleaning products are rampant in prisons across the United States.  Due to COVID-19, jail conditions which are objectively harsh anyway, became even more harsh. GEO was not spared.

During this COVID-19 pandemic, Mr. Francis experienced several lock downs, limited attorney visits, no family visits, limited showers and often times no clean clothes. Moreover, the complete and daily anxiety that Mr. Francis experienced while being locked in a "petri dish" type environment was at that time unimaginable. The public were able to stay home, social distance, change their masks, choose what toilet to use, wash their hands as much as possible and avoid people.  Mr. Francis was unable to do any of that.  Most importantly, Mr. Francis was unable to ***see or touch*** any of his family members.  To be clear, for several months at a time, in the most humane and just country on earth, Mr. Francis was not able to speak to or see his family.  This circumstance, a sharp departure from Mr. Francis's former daily routine, made Mr. Francis's incarceration at upstate Prison facilities, Rikers Island and Essex County Jail absolutely excruciating.  Each hour felt like 2 hours and each day felt like 2 days.  But then things got worse. His anxiety grew immensely because he was concerned about catching COVID and he was seeing people around him contract COVID.

Literally every day when Mr. Francis woke up, he thought he was going to contract COVID, get sick and possibly die because the officers were coming in and out of the jails and not properly wearing masks, inmates were getting sick and it appeared to Mr. Francis

that the jails simply did not care. Although, Mr. Francis was incarcerated during the entirety of COVID, it felt more like several years. Hence, we agree with Judge McMahon when she stated that "that the conditions to which she (Ms. Days) was subjected (at MCC) are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Tiffany Days*, 19 Cr 619 (CM)(4/29/21, Sentencing Transcript p. 19)(Defendant's 4th felony conviction, pleaded guilty to reduced charge of 21 USC 841(b)(1)(B), firearm possessed, sentenced to 60 months in large part due to the conditions at MCC). The conditions at his Upstate Prison, Rikers and Essex County Jail were similar to the conditions at MCC. We also wholeheartedly agree with Judge Oetken's assessment in ***United State v. Daniel Gonzalez, 18 Cr. 669, (JPO), 4/2/21, Dkt 249 stating in sum and substance that time served during COVID should count at least 1.5 to 2 times actual time.*** While MCC was horrific and ultimately shuttered, Mr. Francis' facilities were equally inhumane and as such if Mr. Francis spent almost twenty-seven (27) months at the upstate facility, Rikers and Essex County Jail during COVID that time should equal approximately fifty-four (54) months.

While we are not seeking a downward departure due to the COVID-19 pandemic, we definitely believe that Mr. Francis's incarceration during the pandemic warrants a significant downward variance and he should be credited at least 1.5 days for every day he served from February 2020 to May 2022. We note that the Probation Department recommends an 72 month sentence. This recommendation, however, does not appear to take into account the days spent during the pandemic that several courts have granted additional time for every day served.

Indeed, several Courts in this District have reduced sentences based on the pandemic and unduly harsh pretrial conditions of detention. See e.g., *United States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020) (substantial downward variance from 30 to 37 months to six months in part because of the "horrific conditions" at MCC during the pandemic). See also, *United States v. Morgan*, 19 Cr. 209 (RMB)(S.D.N.Y. May 5, 2020)(cutting the sentence to less than half of the low end of the Guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); *United States v. Franciss*, 19 Cr. 863 (VSB),(S.D.N.Y. May 4, 2020)(reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); and *United States v. Pierson*, 14 Cr. 855 (LTS)(S.D.N.Y. May 4, 2020)(same for defendant detained at MDC).

## AVOID SENTENCING DISPARITIES

*United States v. Butler*,

Based on a review of filed sentencing documents, Mr. Butler was held responsible for 2 kilograms of crack and 50 kg of marijuana. Mr. Butler either has a Criminal History Category of IV or a Criminal History Category of VI. He has a Final Offense Level of 31. Additionally, Mr. Brown was on probation when he committed this offense. Notably, the Probation Department determined that Mr. Butler was a Career Offender based on his Assault in the First Degree Youthful Offender Adjudication. (p. 3 Defense Submission).

*United States v. Cooks,*

Based on review of filed documents in this matter, Mr. Cooks pleaded guilty to Count 10 of the Indictment charging him with conspiring to distribute crack cocaine and

marijuana.  Mr. Cooks Guideline Range was 135 – 168 based upon an Offense level of 31 and a Criminal History Category of III. Probation then recommended a sentence of 120 months. Finally, it is alleged that Mr. Cooks actually discharged a firearm at other individuals.

The Court noted at sentencing that after Mr. Cooks was arrested, he was "clearly glorifying guns with his posts on social media—calling himself Mr. Shoot at the Crowd". Thereafter, the Court sentenced Mr. Cooks to 72 months of incarceration. Notably, the Government agreed that had Mr. Cooks pleaded guilty to powder cocaine, his sentencing range would have been  70 – 87 months.

*United States v. Robert Lewis*,

Based upon a review of the filed submissions, Mr. Lewis has an offense level of 32 and a criminal history of II. According to the Government, Mr. Lewis was observed with multiple firearms and allegedly discharged a firearm at other individuals. After hearing both parties, the Court noted the seriousness of the offense, Mr. Lewis medical issues and ultimately sentenced Mr. ewis to 60 months of incarceration.

*United States v. Stefan Lewis*

Based upon filed documents in this matter, the Government has stated that Mr. Lewis sold crack cocaine; provided guns to other members of the gang and one of those guns allegedly was used to shoot at rival gang members.  Additionally, the Government alleges that Mr. Lewis participated in fraud by creating fake credit cards; printing fake checks; and stealing checks from mailboxes.  According to the Government, and based upon a crack guidelines analysis, Mr. Lewis has a Guidelines Range of 135 – 168 months (adjusted to 63 – 78 months for powder).  Mr. Lewis was ultimately sentenced to **60 months** of imprisonment.

Mr. Francis, like his co-defendants, admitted to being a member of the Clay Avenue Mac Ballas and pursuant to that membership he admitted to participating in robberies and the sale of marijuana. Unlike his co-defendants, however, Mr. Francis pleaded guilty to the Count 1 of the Indictment rather than Count 10. Notably, Mr. Francis had already pleaded guilty to relevant conduct of this Indictment and had served approximately 20 months of incarceration inside of city and state facilities.  He should not, however, be sentenced to more time than his co-defendants simply because he pleaded guilty to different charges contained in the Indictment.

To be clear, similar to his co-defendants (as argued by filed Government sentencing submissions) Mr. Francis participated in robberies related to Clay Avenue membership. Unlike Mr. Cooks, however, Mr. Francis was not on supervision when he was charged with committing these crimes. Indeed, Mr. Francis was inside of a State Prison when he was charged with this federal indictment.  Additionally, unlike his co-defendant's, we do not believe that Mr. Francis actually discharged a firearm at or in the direction of anyone. Moreover, Mr. Francis was not in charge of the delivery of firearms to other gang members. While Mr. Francis rearing may not have been as horrific as some of his co-defendants, he did have to endure the trauma of growing up in a neighborhood replete with gang activity, shootings, robberies and murder.

Finally, unlike his co-defendants, Mr. Francis had already pleaded guilty to relevant conduct in this case and had served approximately two (2) years for some of the conduct for which he is about to be sentenced.  Consequently, we believe that the ceiling of incarceration for Mr. Francis should be a total of sixty (60) months while noting that we are suggesting that he be sentenced to a total of forty-eight (48) months.

## Conclusion

For the foregoing reasons, we are respectfully requesting that a sentence of **forty-eight (48) months**[3] is "sufficient but not greater than necessary" for Mr. Francis' participation in this Conspiracy.

Respectfully submitted,

/s/  *Xavier R. Donaldson*

Xavier R. Donaldson
Attorney for Devonte Francis

cc:     Assistant U.S. Attorney
        via email

---

[3] For clarity, prior to being transported to federal custody in this matter, Mr. Francis had already been incarcerated in City/State facilities related to conduct in this Indictment from January 2019 – September 2020 (20 months). Thus, if the Court sentences Mr. Francis to 28 months, he would serve a total of forty-eight (48) months (20+28). If the Court sentences Mr. Francis to 40 months, he would serve a total of 60 months (20+40). On the other hand, if the Court sentences Mr. Francis to 60 months, then Mr. Francis would serve a total of eighty (80) months (20+60).